UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
UNITED STATES OF AMERICA,

                                        17 Cr. 611 (RWS)
                                        OPINION

        -against-

MICHAEL WHITE, et al.,

                        Defendants.
------------------------------------X

A P P E A R A N C E S:


            Attorneys for the United States

            GEOFFREY S. BERMAN
            United States Attorney for the
            Southern District of New York
            One St. Andrew's Plaza
            New York, NY 10007
            By:  Jordan Estes, Esq.
                 Gina Castellano, Esq.
                 Alexandra Rothman, Esq.


...NY
...JMENT
...ECTRONICALLY FILED
DOC #:
DATE FILED: X-X-X

            Attorneys for Michael White

            DECHERT LLP
            1095 Avenue of the Americas
            New York, NY 10036
            By:  Tanner Kroeger, Esq.
                 Michael J. Gilbert, Esq.
                 Amanda N. Tuminelli, Esq.
                 Samantha Rosa, Esq.


            Attorneys for Allen Knight

            HOGUET NEWMAN REGAL & KENNEY, LLP
            10 East 40th Street
            New York, NY 10016
            By:  John P. Curley, Esq.
                 John J. Kenney, Esq.

Attorneys for David Oquendo

LAW OFFICE OF KENNETH J. MONTGOMERY, PLLC
198 Rogers Ave
Brooklyn, NY 11225
By:  Kenneth J. Montgomery, Esq.


Attorneys for Christopher Howard

RICHARD LIND
575 Lexington Ave
New York, NY 10022
By:  Richard B. Lind, Esq.

**Sweet, D.J.**

Defendants Michael White ("White"), David Oquendo ("Oquendo"), Allen Knight ("Knight"), and Christopher Howard ("Howard") (collectively, the "Moving Defendants") have moved (1) to dismiss the racketeering conspiracy charges in the original indictment (the "Original Indictment"); (2) to dismiss the firearms charges in the Original Indictment; (3) to dismiss the firearm charge as to White in the superseding indictment (the "Superseding Indictment") (4) to suppress the Facebook search warrant; (5) to suppress other evidence; (6) for a bill of particulars; (7) for various forms of severance; (8) for court orders directing the Government to disclose various items, including *Brady*, *Giglio*, Rule 404(b) evidence, and its witness list, and for a court order directing the Government to certify its compliance with the Ogden Memorandum.

Based on the facts and conclusions set forth below, Defendants' motions are denied.

## I.    **Prior Proceedings**

On October 4, 2017, a grand jury in the Southern District of New York returned a nine-count indictment charging

1

the Moving Defendants and ten other defendants, and setting forth charges related to alleged gang activity in the Bronx.[1] Defendants White and Oquendo have been charged as members of two violent street gangs: the "Young Gunnaz," or "YGz," and "MBG," which stands for "Millbrook Gangstas" or "Money Bitches Guns." Defendants Knight and Howard have been charged as members of the YGz and the MBG, respectively. The Indictment asserts that feuds between these gangs and their rivals have resulted in attempted murders, shootings, assaults, and other acts of violence, effectively creating a war zone in the South Bronx for several years. The Government attempts to show that MBG and YGz members committed violent acts to protect the reputation of the gangs, to protect fellow gang members, and to further their disputes with rivals.

The Original Indictment alleges racketeering conspiracies (Counts One and Two); conspiracy to distribute narcotics (Count Three); violent crimes in aid of racketeering (Counts Four through Six); and firearms offenses (Counts Seven through Nine).

---

[1]     The present pretrial motions were originally brought by several defendants who have since pled guilty, including defendants Demetrius Wingo, James Robinson, Oscar Briones, and James Snipes. Accordingly, the motions as to these defendants are moot.

2

The present pretrial motions on the Original
Indictment were filed by Moving Defendants on June 29, 2018, and
heard and marked fully submitted on July 26, 2018.

On July 16, 2018, a grand jury in the Southern
District of New York returned a twelve-count Superseding
Indictment charging the Moving Defendants and six other
defendants based on the same gang activity alleged in the
Original Indictment. The Superseding Indictment alleges
racketeering conspiracies (Counts One and Two); conspiracy to
distribute narcotics (Count Three); violent crimes in aid of
racketeering (Counts Four through Six); firearms offenses
(Counts Seven through Twelve).

White, Knight, and Howard have been arraigned on the
Superseding Indictment. Oquendo has yet to be arraigned on the
Superseding Indictment.

White's motion to dismiss Count Eleven of the
Superseding Indictment was filed on August 2, 2018, and heard
and marked fully submitted on August 15, 2018[2].

---

[2]      By letter dated August 15, 2018, the Government
sought, in the alternative, for decision to be reserved on the
motion to dismiss Count Eleven of the Superseding Indictment

## II. The Defendants' Motion to Dismiss the Racketeering Conspiracy Charges in the Original Indictment is Denied

The Moving Defendants have moved to dismiss Counts One and Two of the Original Indictment charging conspiracy to participate in the MBG and YGz racketeering enterprises, claiming that each count fails to sufficiently allege the existence of a RICO conspiracy and Defendants' participation in the RICO conspiracy.

Federal Rule of Criminal Procedure 12(b)(3)(B) provides in relevant part that "at any time while the case is pending, the court may hear a claim that the indictment . . . fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). "A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide only a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Post*, 950 F. Spp. 2d 519, 527 (S.D.N.Y. 2013) (internal quotation marks and citations omitted) (citing Fed. R. Crim. P. 7(c)(1)). "The indictment is sufficient if it 'contains the elements of the offense charged and fairly

---

until after trial pursuant to Fed. R. Crim. P. 12(d). Gov't Letter, Aug. 15, 2018, ECF No. 229.

4

informs a defendant of the charges against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (noting that an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime").

In the RICO conspiracy context, courts have repeatedly held that "[n]either overt acts, nor specific predicate acts that the defendant agreed personally to commit, need be alleged or proven for a section 1962(d) offense." *United States v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011) (internal quotation marks and citation omitted); *see also Salinas v. United States*, 522 U.S. 52, 64 (1997) ("The RICO conspiracy statute broadened conspiracy coverage by omitting the requirement of an overt act."). A racketeering conspiracy "requires proof that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering and that the conduct prong requires only that conspirators reached a meeting of the minds as to the operating of the affairs of the enterprise through a pattern of racketeering conduct." *Id.* at 77 (internal quotation marks omitted) (citing *United States v.*

5

*Basciano*, 599 F.3d 184, 199 (2d Cir. 2010)). A conspirator's "knowledge of only the general contours of the conspiracy" is sufficient under the racketeering statute. *Id.* (internal quotation marks omitted). Furthermore, the Government "need not prove that the defendant himself agreed that he would commit" particular predicate acts. *United States v. Yannotti*, 541 F.3d 112, 121 (2d Cir. 2008) (citing *Salinas*, 522 U.S. at 64). Thus, as the Second Circuit has emphasized, racketeering conspiracy is a "conspiracy to participate in a charged enterprise's affairs" through a pattern of racketeering, "not [a] conspiracy to commit predicate acts." *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987).

Defendants urge that predicate acts must be alleged, contrary to the statement of the law above.

Here, Counts One and Two track the language of 18 U.S.C § 1962(d), the statute the Moving Defendants are charged with violating. *Compare* Indictment ¶¶ 5-6, 11-12 *with* 18 U.S.C. §§ 1962(c) and (d) (making it unlawful (i) "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity" and (ii) to

6

conspire to do so). Pursuant to Section 1961, "'Racketeering activity' means (A) any act of threat involving murder . . ., which is chargeable under State law and punishable by imprisonment for more than one year; . . . (D) any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance of listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States." 18 U.S.C. § 1961. Counts One and Two of the Indictment each allege, among other things, the following:

- The charged defendants were "employed by and associated with the racketeering enterprise;"

- The enterprise "was engaged in, and the activities of which affected, interstate and foreign commerce;"

- The charged defendants "willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of [MBG/YGz] through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5);"

- The pattern of racketeering activity included "[a]cts involving murder, chargeable under the following provisions of state law: New York Penal Law, Sections 125.25 (murder), 105.15 (conspiracy to commit murder), 110.00 (attempted murder), and 20.00 (aiding and abetting); and offenses involving the distribution of controlled substances, including marijuana and cocaine base

7

in a form commonly known as 'crack,' in violation
of the laws of the United States, namely Title
21, United States Code, Sections 812, 841(a)(1),
and 846;" and

- "it was part of the conspiracy that each
defendant agreed that a conspirator would commit
at least two acts of racketeering in the conduct
of the affairs of the Enterprise"

Indictment ¶¶ 5-6, 11-12. Counts One and Two also allege the
"purposes" and the "means and methods" of each enterprise. *See*
Indictment ¶¶ 3-4, 9-10. Moreover, Counts One and Two each
detail the predicate racketeering acts, including the specific
state penal code sections and federal statutes that the
Government alleges constitute the pattern of racketeering
activity: murder, conspiracy to commit murder, attempted murder,
and the distribution of marijuana and crack cocaine.

Accordingly, the racketeering acts alleged in Counts
One and Two qualify as predicate racketeering acts. *See Applins*,
637 F.3d at 81 ("Because a RICO conspiracy charge need not
specify the predicate or racketeering acts that the defendants
agree would be committed, it is sufficient to allege and prove
that the defendants agreed to the commission of multiple
violations of a specific statutory provision that qualifies as
RICO racketeering activity."); *see also Salinas*, 522 U.S. at 65
(internal citations omitted) ("It is elementary that a
conspiracy may exist and be punished whether or not the

8

substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself. It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.").

Accordingly, Defendants' motion to dismiss the racketeering conspiracies charges in the Original Indictment is denied.

## III. **The Defendants' Motion to Dismiss the Firearms Charges in the Original Indictment Is Denied**

Defendants White, Oquendo, and Knight have moved for dismissal of Counts Seven and Eight of the Indictment pursuant to Rule 7 of the Federal Rules of Criminal Procedure. Counts Seven and Eight of the Indictment charge the use, carrying, and discharge of firearms in connection with a "crime of violence," (namely, the racketeering conspiracies charged in Counts One and Two of the Indictment, respectively), in violation of Title 18, United States Code, Section 924(c) ("Section 924(c)").

9

Defendants argue that the racketeering conspiracies do not qualify as a "crime of violence" as required by Section 924(c).

Section 924(c) provides enhanced punishment for those who, among other things, use or carry a firearm "during and in relation to any crime of violence" that is itself in violation of federal law. 18 U.S.C. § 924(c)(1)(A). The statute defines "crime of violence" as an offense that is a felony and either:

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3). Section 924(c)(3)(A) is commonly referred to as the "force clause," while Section 924(c)(3)(B) is commonly referred to as the "residual clause" or "risk-of-force clause."

When the alleged underlying "crime of violence" is racketeering activity, a court must "look to the predicate offenses to determine whether a crime of violence is charged." *United States v. Ivezaj*, 568 F.3d 88, 96 (2d Cir. 2009). "[W]here the Government proves (1) the commission of at least two acts of racketeering and (2) at least two of those acts qualify as 'crime[s] of violence' under § 924(c)," a Section

10

1962 conviction serves as a predicate for a conviction under Section 924(c). *Id.* "Likewise, a conspiracy may be a crime of violence where the conspiracy involves an agreement to commit a predicate crime that would itself be a crime of violence." *United States v. Conyers*, No. S13 15-CR-537 (VEC), 2016 WL 7189850, at *4 (S.D.N.Y. Dec. 9, 2016); *see also United States v. Praddy*, 729 F. App'x 21, 23 (2d Cir. 2018) (internal citation omitted) ("A racketeering conspiracy is a crime of violence if at least one of its objects is committing a crime of violence.").

The Moving Defendants contend that they cannot be punished under Section 924(c) because the racketeering conspiracies charged in Counts One and Two do not constitute a "crime of violence" within the meaning of the statute.

The Second Circuit has repeatedly recognized that a racketeering conspiracy with violent predicate acts is a "crime of violence." In *United States v. Scott*, 681 F. App'x 89, 95 (2d Cir. 2017), the Second Circuit held that a racketeering conspiracy with predicates of attempted murder in the second degree under New York law was a crime of violence under Section 924(c)(3)'s force clause because such attempted murder "is a

11

crime unmistakably involving 'an attempted use . . . of physical force'" within Section 924(c)(3)(A).

Here, the racketeering conspiracies alleged in Counts One and Two charge a pattern of racketeering activity consisting of, among other things, "acts involving murder" under New York law. *See* Indictment ¶¶ 5(a), 11(a). Accordingly, because the predicate acts of the RICO conspiracies are acts of violence, the RICO conspiracies are "crimes of violence" for purposes of Section 924(c). This motion is denied.

## IV. **Defendant White's Motion to Dismiss the Firearm Charge of the Superseding Indictment is Denied**

Defendant White has moved to dismiss Count Eleven of the Superseding Indictment ("Count Eleven") as time-barred. Count Eleven charges White with firearms offenses in connection with his participation in the YGz racketeering conspiracy and the October 28, 2012 shooting of rival gang members in aid of the YGz racketeering conspiracy.

Defendant argues Count Eleven should be dismissed because it substantially amends the Section 924(c) charge in Count Eight of the Original Indictment ("Count Eight") because

12

Count Eleven is predicated on Count Two *and* Count Four, whereas Count Eight was only predicated on Count Two. Because of this substantial amendment, White contends that Count Eleven does not "relate back" to the filing of the Original Indictment, and is therefore time-barred. Moreover, White argues Count Eight never tolled the statute of limitations on a Section 924(c) charge predicated on the October 28, 2012 shooting.

Upon the filing of an indictment, "the statute of limitations is tolled as to the charges contained in that indictment." *United States v. Grady*, 544 F.2d 598, 601 (2d Cir. 1976). A superseding indictment will be said to "relate back" to the date of any validly pending indictment, and thereby obtain the benefit of its filing date, if the superseding indictment does not "broaden or substantially amend the original charges." *United States v. Gengo*, 808 F.2d 1, 3 (2d Cir. 1986). In determining whether a superseding indictment materially broadens or amends the original charges, courts will consider "whether the additional pleadings allege violations of a different statute, contain different elements, rely on different evidence, or expose the defendant to a potentially greater sentence." *United States v. Salmonese*, 352 F.3d 609, 622 (2d Cir. 2003) (citation omitted). "No single factor is determinative; rather the 'touchstone' of [the analysis] is notice, i.e., whether the

13

original indictment fairly alerted the defendant to the
subsequent charges against him and the time period at issue."
*Id.* (citing *Gengo*, 808 F.2d at 3).

Courts have routinely deemed superseding indictments
"timely when they simply added detail to the original charges,
narrowed rather than broadened the charges, contained amendment
as to form but not substance, or were otherwise trivial or
innocuous." *United States v. Ben Zvi*, 168 F.3d 49, 54 (2d Cir.
1999); *see e.g.*, *United States v. Gerstner*, 548 F. Supp. 348,
349 (S.D.N.Y. 1982) (superseding indictment with new counts
"based on exactly the same factual allegations which underlay .
. . the original indictment" was timely because defendant was
not called upon to address any new factual accusations or
exposed to additional penalties).

Here, Count Eleven does not broaden or materially
amend the charges in Count Eight. The elements of a Section
924(c) charge require the Government to prove: (1) that the
defendant used or carried a firearm, and (2) that he did so
during and in relation to a crime of violence subject to
punishment in a court of the United States. *See United States v.
Rodriguez-Moreno*, 526 U.S. 275, 280 (1999). The Government
properly alleged both elements in Count Eight, as noted above,

14

and has not introduced any new evidence, alleged violations of a new statute, or exposed the Defendant to a potentially greater sentence by adding reference to Count Four as a predicate act in Count Eleven. *See Salmonese*, 352 F.3d at 622 (listing factors courts consider in determining whether an indictment is materially amended); *see also Gengo*, 808 F.2d at 2-4 (finding superseding indictment that offered a new substantive count, added an overt act, and altered commencement date of conspiracy did not broaden original indictment). Adding Count Four in the Superseding Indictment merely specifies a particular incident which was also alleged within the parameters of Count Two in the Original Indictment.

Rather, because the central inquiry of the relation-back doctrine is "notice," *see Salmonese*, 352 F.3d at 622, and because White had notice of all the allegations in Count Eleven in the Original Indictment, including the incident of October 28, 2012, no prejudice has been shown here. Defendant's motion to dismiss Count Eleven is denied.

15

## V.   The Defendants' Motion to Suppress the Facebook Search
   Warrant is Denied

Defendant White has moved for suppression of all
electronic evidence seized by the Government from search
warrants directed to Facebook pursuant to the Fourth Amendment
to the U.S. Constitution.

On December 9, 2016, the Honorable Katharine H. Parker
issued a search warrant (the "Initial Warrant") authorizing the
Government to obtain and search the contents of ten Facebook
accounts believed to belong to or be used by members of MBG and
the YGz, as well as rival gang Killbrook. The target accounts
included an account believed to belong to Michael White,
https://www.facebook.com/mbgmikewhite. On December 14, 2016,
Judge Parker issued an amended search warrant (the "Amended
Warrant"), which corrected the URL address for the Facebook
account used by White's codefendant, Snipes. In support of each
application for the search warrant, the Government submitted a
detailed affidavit from Detective Jared Tepperman of the NYPD
(the "Tepperman Affidavit"). The Tepperman Affidavit outlined
specific facts demonstrating that there was probable cause to
believe that Michael White and the other account holders had
engaged in criminal activity and that there was probable cause

that the Facebook accounts would contain evidence of those crimes. The Tepperman Affidavit stated, in relevant part, the following about the broader investigation into the gangs in the Mill Brook Houses:

8.    Beginning in about October 2016, the [NYPD] has conducted an investigation into two rival street crews operating in vicinity of the Mill Brook Houses in the Bronx, New York. The investigation has revealed that since about at least 2009 and continuing through the present, members and associates of the two crews have been involved in a variety of racketeering acts, including murders, attempted murders, robberies, narcotics trafficking, and other offenses including firearms offenses.

9.    The Mill Brook Houses are a complex of residential buildings in the Southern Bronx bordered by East 135th Street to the South, East 137th Street to the North, Cypress Avenue to the East, and Brook Avenue to the West. The Mill Brook Houses are located on a hill, where the hill slopes from uphill in the East to downhill in the West.

10.    The two rival crews based in the vicinity of the Mill Brook Houses are known as "Mill Brook Up," which is based in the uphill section of the complex, and "Mill Brook Down," which is based in the downhill section of the complex. Although the crews are named based on the geography of the complex, members of "Mill Brook Up" may live in the downhill part of the Mill Brook Houses complex, and vice versa. Members and associates of Mill Brook Up and Mill Brook Down include members and associates of other street gangs, including the "Young Gunnaz" ("YGz") and the Bloods. For example, several members of Mill Brook Up are also members or associates of the broader YGz gang.

11.    Members and associates of Mill Brook Up and Mill Brook Down sell narcotics in the vicinity of the Mill Brook Houses. Mill Brook Up and Mill Brook

17

Down primarily sell marijuana, crack cocaine, and heroin.

12.  In addition to narcotics trafficking, Mill Brook Up and Mill Brook Down members and associates engage in acts of violence, including shootings, stabbings, robberies, and gang assaults. Members who engage in a sufficient amount of violence can earn a leadership position in each respective crew.

13.  Evidence in this investigation and certain information described below concerning the TARGET FACEBOOK ACCOUNTS is based upon evidence obtained from:

     a.  Undercover purchases of narcotics.

     b.  Surveillance conducted by law enforcement authorities.

     c.  Evidence obtained through search warrants of seized cellular telephones of gang members and associates arrested already by law enforcement authorities.

     d.  Prison calls of related gang members and associates in state or federal custody.

     e.  The expected testimony of cooperating witnesses who were members of Mill Brook Up or other related gangs at various times relevant to the investigation. Each CW is cooperating with this investigation in the hopes of obtaining a cooperation agreement and leniency at sentencing. Specifically, and among other cooperating witnesses, CW-1 and CW-2, who were members of Mill Brook Up and the YGz, have proffered with the Government and have admitted their participation in a murder and other crimes, and have provided information about crimes committed by others, but have not yet pleaded guilty pursuant to cooperation agreement. Each CW's information has been corroborated by, among other things, information already known to law enforcement and evidence gathered independent of the CW's

18

               information, such as information from other
               witnesses and recorded prison calls.

     f.   Social media evidence showing the subjects
          engaged in gang-related activity.

        The Tepperman Affidavit then outlined specific
information related to Michael White's participation in the
gangs, including evidence found on his publicly available
Facebook page:

     a.   https://www.facebook.com/mbgmikewhite
          ("ACCOUNT-3"). This account bears the name
          "Prince HandsomeGunna Mike." Based on my
          review of the publicly available portions of
          ACCOUNT-3 and on my conversations with other
          law enforcement officers and my review of
          reports and documents, I have learned the
          following, in substance and in part:

        i.   From my review of the publicly available
            portions of ACCOUNT-3, I recognize an
            individual depicted in several pictures
            uploaded to ACCOUNT-3 as MICHAEL WHITE.
            The URL for ACCOUNT-3 includes the name
            "mikewhite." Based on the foregoing, I
            believe the user of ACCOUNT-3 is MICHAEL
            WHITE.

       ii.  On or about January 29, 2015, the user of
            ACCOUNT-3 posted a photograph of an
            individual I recognize to be WHITE making
            a sign with his hand that I know to
            represent affiliation with the YGz gang.

      iii. On or about August 11, 2016, the user of
            ACCOUNT-3 posted a photograph of WHITE,
            ANDRE COFIELD, who is another target of
            this investigation, and other
            individuals. The photograph included the
            caption "We some crazy MF [mother

19

f\*\*\*ers] .. But I love my Bro'z there's
some more don't get it twisted!!!"

iv. On or about August 3, 2016, the user of
ACCOUNT-3 posted a photograph of WHITE
and fellow YGz member SEDA in which both
WHITE and SEDA are making hand signs that
I recognize to represent affiliation with
the YGz. The user of ACCOUNT-3 included
the caption "Bless G-Day to mY YGunna
#FreeAndWhite #1690 #SMG #MBG," which I
believe to indicate the user's desire
that SEDA be freed from jail
("#FreeAndWhite," SEDA's alias) and the
user's proclamation that SEDA is "mY
YGunna," or a fellow member of the YGz.
Additionally, based on my involvement in
this investigation and conversations with
CW-1, I believe that "MBG," which is also
present in ACCOUNT-3's vanity name,
stands for "Money, Bitches, Guns," and
"Mill Brook Gangstas," and is a set
affiliated with Mill Brook Up. CW-2
informed law enforcement officials, in
sum and substance and among other things,
that WHITE was a leader of the Mill Brook
Up crew.

The Amended Warrant then directed Facebook to disclose
to the Government records from the target accounts from January
1, 2009 to the present. The Amended Warrant authorized law
enforcement personnel to review the records from the target
accounts for evidence, fruits, and instrumentalities of
violations of Title 18, United States Code, Section 1962(d);
Title 18, United States Code, Section 924(c); and Title 21,
United States Code, Section 846. The Amended Warrant was served

on Facebook, which subsequently produced records related to the target accounts. As detailed in the Government's June 27, 2018 letter regarding Michael White's bail application, White's Facebook account contains extensive evidence responsive to the Amended Warrant, including evidence of the existence of the MBG and YGz racketeering conspiracy.

White argues the Tepperman Affidavit supporting the Initial Warrant failed to establish probable cause and lacked particularity, and that the good faith exception does not apply here.

The Government contends that Defendant has failed to establish standing in order to challenge this search. In the alternative, the Government asserts that the Tepperman Affidavit was both supported by probable cause and sufficiently particular to survive this motion.

Fourth Amendment rights are personal rights and may not be vicariously asserted. *See United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002). A defendant seeking to suppress evidence based on an alleged Fourth Amendment violation must therefore demonstrate that he had a reasonable expectation of privacy in the location or items searched. *Rakas v. Illinois*, 439 U.S. 128,

162 (1978); *United States v. Padilla*, 508 U.S. 77, 81-82 (1993) (per curiam). In order to meet this standard, the defendant generally must establish at the outset that he had a "property or possessory interest in the place searched or the items seized." *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir.1991) (citations omitted); *see also, e.g.*, *United States v. Serrano*, 13 Cr. 58 (KBF), 2014 WL 2696569, at *4 (June 10, 2014); *Guzman v. Sabourin*, 124 F. Supp. 2d 828, 834 (S.D.N.Y. 2000); *United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993). The burden rests on the defendant to prove the facts necessary to establish that his personal Fourth Amendment rights were violated. *See United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988). That burden "is met only by sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge." *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (citations omitted); *see also, e.g.*, *Serrano*, 2014 WL 2696569, at *4 (citing *Ruggiero*, 824 F. Supp. at 391). An attorney's declaration is insufficient to make the requisite showing. *See Montoya-Eschevarria*, 892 F. Supp. at 106.

Here, White has failed to establish standing as required to bring this motion to suppress because neither he nor a person with personal knowledge has demonstrated by sworn

22

evidence that White had any property or possessory interest in the Facebook account. Instead, White takes issue with whether the account is his, noting that the Government's search application "did not set forth enough information linking the account to White." White Br. at 13.

Moreover, White may not rely on the evidence cited by the Government in the Tepperman Affidavit in order to establish standing. This Circuit has routinely rejected efforts by defendants to establish Fourth Amendment standing based on the Government's allegations or evidence. *See, e.g.*, *United States v. Watson*, 404 F.3d 163, 166-67 (2d Cir. 2005) (internal citation omitted) (holding that a defendant does not establish standing sufficient to challenge a search "merely because he anticipate[s] that the Government will link the objects recovered in that search" to him "at trial."); *Serrano*, 2014 WL 2696569, at *7 (June 10, 2014) (holding that defendant could not establish standing to move to suppress cell phone location data by "rely[ing] on the Government's position that it intends to link the defendant to the cell phone at trial as a basis for such an interest"); *United States v. Cody*, 434 F. Supp. 2d 157, 167 (S.D.N.Y. 2006) (holding that the fact that Government found defendant's fingerprints on bag and planned to link him to it at trial did not permit court to "ignore his refusal to claim

23

ownership" of the bag); *Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (holding that "defendant's unsworn assertion of the Government's representations does not meet [his] burden" of establishing standing).

Even assuming standing, White has failed to show that the warrant was not supported by probable cause and that it failed to satisfy the particularity requirement. The Fourth Amendment provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation," (the "Warrant Clause"). U.S. Const. amend. IV. Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts," and as such is not "readily, or even usefully, reduced to a neat set of legal rules." *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Rather, in evaluating probable cause, the court must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Falso*, 544 F.3d at 117 (quoting *Gates*, 462 U.S. at 238).

"[T]he resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to

warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir.
1993) (quoting *Jones v. United States*, 362 U.S. 257, 270
(1960)). "[A] court reviewing a challenged warrant—whether at
the district or appellate level—must accord considerable
deference to the probable cause determination of the issuing
magistrate." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir.
2011) (internal quotation and citation omitted).

White argues the search warrant was unsupported by
probable cause because there was insufficient evidence linking
the account to White and the account to the crimes alleged.

However, according to the totality of the
circumstances, there was probable cause to believe White was the
user of the Facebook account. The URL name of the account was
"mbgmikewhite." While the Defendant argues the name "Michael
White" is a common name, the distinguishing characteristic here
is that the name "Mike White" is linked to the "MBG" gang of
which White is alleged to be a part. *See* Tepperman Aff. ¶
17.c.i.v.-v. The vanity name, "Prince HandsomeGunna Mike,"
contains the name "Mike" and links the account to the other gang
of which White is also alleged to be a member, the "Young
Gunnaz." Further, the Tepperman Affidavit states that Detective
Tepperman recognized White in "several pictures" uploaded to the

Facebook account. Tepperman Aff. ¶ 17.c.i. This information collectively is sufficient to constitute probable cause linking the Facebook account to Michael White.

Moreover, there was probable cause linking the Facebook account to the crimes alleged. As detailed above, the Tepperman Affidavit outlined the evidence supporting the belief that members of the YGz and MBG were involved in racketeering acts such as attempted murder and narcotics trafficking. The Tepperman Affidavit also relied on statements from CW-2, coupled with publicly available Facebook posts, to establish White's involvement in the MBG.

White takes issue with three photos described in the Tepperman Affidavit, arguing that they do not "come close" to establishing probable cause that the Facebook account was likely to contain evidence of the crimes charged because the three photos do not depict "gang paraphernalia, drugs, or weapons." White Br. at 14. However, evidence of a defendant's involvement in a racketeering conspiracy may consist of things other than the photographs of drugs or guns. To establish a racketeering conspiracy, the Government must establish only the defendant's association with the enterprise. *See United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (finding rap videos and tattoo

26

evidence admissible to show defendant's association with the enterprise).

The Government was reasonable in believing the Facebook account would provide evidence of White's involvement in the racketeering conspiracy. For example, the August 3, 2016 Facebook post included the caption "Bless G-Day to mY YGunna #FreeAndWhite #1690 #SMG #MBG." As explained in the Tepperman Affidavit, this post depicts White's affiliation with the YGz by reference to "mY YGunna" and to the "MBG" with reference to "#MBG." The Tepperman Affidavit referenced another post, which showed White making a gang sign reflecting his affiliation with the YGz. This evidence, in combination with the URL and vanity name of the account, established probable cause to suspect White's affiliation with the gangs, and therefore to believe that White's Facebook account would contain evidence of the crimes alleged.

Defendant also argues that the Initial Warrant was overbroad and lacked particularity as required by the Fourth Amendment, and requests the suppression of the fruits of that warrant.

27

In addition to its probable cause requirement, the
Warrant Clause contains a prohibition against "general
warrants." *Andresen v. Maryland*, 427 U.S. 462, 480 (1976). "The
problem [posed by the general warrant] is not that of intrusion
per se, but of a general, exploratory rummaging in a person's
belongings . . . . [The Fourth Amendment addresses the problem]
by requiring a 'particular description' of the things to be
seized" as well as the place to be searched. *Id.* at 480 (quoting
*Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

To satisfy the particularity requirement, a warrant
must: (1) "identify the specific offense for which the police
have established probable cause"; (2) "describe the place to be
searched"; and (3) "specify the items to be seized by their
relation to designated crimes." *United States v. Ulbricht*, 858
F.3d 71, 99 (2d Cir. 2017) (internal citation omitted). "The
Fourth Amendment does not require a perfect description of the
data to be searched and seized." *Id.* at 100. Rather, the
requirement is satisfied if the warrant, including its
attachments, enables the executing officer to ascertain and
identify with reasonable certainty those items that the
magistrate judge has authorized him or her to seize.

Here, the Amended Warrant satisfied the three
particularity requirements enumerated by the Second Circuit: (1)
it identified the Subject Offenses; (2) it described the place
to be searched (here, White's Facebook account); and (3) it
listed the items to be seized by their relation to the Subject
Offenses. Specifically, the Amended Warrant outlined nine
particular categories of information that Facebook was required
to disclose. It also linked the items to be searched and seized
to suspected criminal activity. For example, the Amended Warrant
authorized law enforcement personnel to review the records for,
among other things, (a) "[c]ommunications between and regarding
Mill Brook Up, Mill Brook Down, YGz, and related gang members
and associates"; and (b) "[p]hotographs, videos, and
communications showing Mill Brook Up, Mill Brook Down, YGz, and
related gang members and associates making gang signs, making
statements signifying their affiliation with the gangs, engaging
in shootings, robberies, drug dealings, and assaults, or
demonstrating rivalries with other gangs . . . ." These
categories expressly limit the seizure to evidence related to
White's participation in the relevant gangs.

Of the nine items Facebook was required to disclose,
White only specifically takes issue with the Government's
request for IP address location information. White argues that

29

the Amended Warrant is insufficiently particular because it "did not specify for which crimes this highly private information was sought." White Br. at 17. However, the Tepperman Affidavit does specify the relevant crime: a multi-year racketeering conspiracy involving attempted murders and drug dealing. This is the sort of complex crime, covering a long period of time, that justifies a broad search warrant. *See United States v. Jacobson*, 4 F. Supp. 3d 515, 522 (E.D.N.Y. 2014) (breadth of warrant was justified given complexity of crimes and length of time covered).

In light of the above, the Defendant's motion to suppress the Facebook search warrant is denied.

## VI. The Defendant's Motion to Suppress Other Evidence Is Denied

Defendant White has moved for suppression of post-arrest statements attributed to White pursuant to the Fifth Amendment to the U.S. Constitution. The Government has stated that it does not intend to introduce at trial any statements made by White following his February 18, 2010 arrest, rendering this motion moot.

## VII. The Defendants' Motion For a Bill of Particulars is Denied

Defendants White, Oquendo, and Knight have moved for a bill of particulars pursuant to Rule 7 of the Federal Rules of Criminal Procedure. Specifically, Defendants contend a bill of particulars must be provided because neither the indictments nor the discovery provided by the Government includes, for example: the evidence the Government intends to use to prove that the members of MBG and YGz constituted a criminal enterprise; the hierarchy of the two enterprises; when White allegedly joined the two different enterprises; how White manifested his intention to join any enterprise in particular; or evidence the Government intends to introduce to prove at least two predicate acts and if White is alleged to have participated in the predicate acts.

"The function of a bill of particulars is to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (citing 1 C. Wright, Federal Practice and Procedure § 129, at 434-35 (2d ed. 1982)). Because "[t]he Second Circuit has 'consistently sustained indictments which track the language of a statute and,

31

in addition, do little more than state time and place in approximate terms,'" *see Salazar*, 485 F.2d at 1277, "[a] bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Triana-Mateus*, 2002 WL 562649, at *5 (citing *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.) (mem.), *cert. denied*, 493 U.S. 834 (1989)).

The Government is not required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, *see United States v. Muyet*, 945 F. Supp. 586, 598-99 (S.D.N.Y. 1996).

Here, all of the counts in the Indictment track the language of the applicable statutes, state the times that the Defendants were allegedly engaged in the offenses, and state the place in approximate terms. Since the unsealing of the Original Indictment in October 2017, the Government has collected and produced no less than nine rounds of common discovery materials pertaining to all defendants, and several rounds of individual

32

discovery materials pertaining to each individual defendant, pursuant to Rule 16 of the Federal Rules of Criminal Procedure. Through the extensive discovery the Government has produced, the Government has "identif[ied] with sufficient particularity the nature of the charge pending against [t]he defendants, thereby enabling the defendant[s] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

## VIII.    **The Defendants' Motion for Severance Is Denied**

Moving Defendants have moved for severance of their trials from co-Defendants pursuant to Rule 14 of the Federal Rules of Criminal Procedure.[3] At present, White is scheduled for trial on September 24, 2018, Knight and Robinson are scheduled for trial on November 5, 2018, and Howard is scheduled for trial on January 7, 2019.[4]

---

[3]      At the hearing on this motion, Knight asked for and was granted the opportunity to defer on this motion until such time at which it is determined which co-defendants are scheduled to be tried alongside him.
[4]      On August 20, 2018, at Oquendo's arraignment on the Superseding Indictment, it was decided that Oquendo's trial date will be determined at a status conference on December 6, 2018.

Because it has yet to be determined whether any
Defendants will be tried together, this motion is denied as
premature. The motion may be brought again within 7 days of the
scheduling of a trial date.

## IX.  **The Defendants' Motion for Pretrial Disclosures is Denied**

Defendants Oquendo and Knight have moved for a court
order directing the Government's disclosure of certain pretrial
materials: (1) early disclosure of notice of prior crimes or bad
acts the Government seeks to introduce at trial pursuant to
Federal Rule of Criminal Procedure 404(b); (2) early disclosure
of 3500 materials and identification of witnesses; and (3)
certification that the Government has turned over all material
required by *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants
have also requested the Government certify its compliance with
the Ogden Memorandum.

Defendants seek an order from the Court directing the
Government to provide notice of past bad acts or crimes the
Government intends to introduce at trial pursuant to Federal
Rule of Evidence 404(b) at least 60 days before trial. The
Government stated in its brief its intention to provide Rule
404(b) notice by July 23, 2018. Having no reason to believe the

34

Government did not timely perform on this intention, and in light of the first trial in this action scheduled for no earlier than September 24, 2018, Defendants' request for Rule 404(b) evidence to be submitted 60 days before trial has effectively been granted. Therefore, this request is rendered moot.

Defendants have also requested that the Government be compelled to provide a list of its witnesses, and that Jencks Act material be disclosed at least 45 days before trial. The Government has stated its intent to share with Defendants any witness statements subject to disclosure under the Jencks Act as well as impeachment materials subject to disclosure under *Giglio v. United States*, 405 U.S. 150 (1972) three weeks before trial. This schedule provides Defendants adequate time to prepare for cross-examination of Government witnesses and is well in advance of the required timetable. *See* 18 U.S.C. § 3500; Fed. R. Crim. P. 26.2. *See, e.g.*, *United States v. Trippe*, 171 F. Supp. 2d 230, 237 (2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify.").

35

Defendants moved for the immediate disclosure of all *Brady* material, whether such material bears on the issue of guilt or the credibility of government witnesses. The Government provides that it has acknowledged its *Brady* obligations in correspondence with defense counsel, that it is not aware of any additional *Brady* materials beyond those it has provided to Defendants, and that in the event that it becomes aware of any further materials they will promptly be produced.

Accordingly, this motion is denied.

In light of the above, the Defendants' request that the Government be compelled to certify its compliance with the Ogden Memorandum is denied.

## X.   Conclusion

For the foregoing reasons, the Defendants' pretrial motions are denied.

It is so ordered.

**New York, NY**
**August 28, 2018**

_____
ROBERT W. SWEET
U.S.D.J.